Per Curiam :
The facts in this case are substantially the same as in the case of Georgia Southern and Florida Railway Company v. United States, No. 50227, this day decided. The principles involved are exactly the same. The shipments were of the same character and moved from the same point to the same destination.
It has been agreed by the parties in a pretrial conference that if the court determines the Pensacola route should not be used as a basis for the rate, then the lowest available rate, as in the Georgia Southern case, would be $11.38 per person.
The plaintiff is entitled to recover the sum of $808.08.
It is so ordered.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff, a corporation, is a common carrier by railroad of passengers and property over its own lines and jointly with other common carriers by railroad and has been such since August 1, 1946, when plaintiff became the legal successor to Seaboard Air Line Railway Company. The latter company had operated the same system of railroads *798 for some time prior to and until December 28, 1930, when receivers were appointed by the United States District Court for the Eastern District of Virginia, who were in possession and operated the property until August 1, 1946. On August 1, 1946, as the result of a final decree of foreclosure and a bill of sale pursuant thereto delivered on August 1, 1946, the plaintiff took over the property and became the transferee by operation of law of the claim in this case for balances due for transportation performed by the former receivers of the railroad.
2. In April 1943 the plaintiff’s predecessors, as the originating carrier and with its connections, performed transportation service for the defendant, by hauling two military coach-freight trains from Camp Blanding, Florida, to Camp Forrest, Tennessee, of 364 officers and men and military impedimenta.
3. At the time of these movements the plaintiff and the defendant were parties to two agreements entitled Joint Military Passenger Agreement No. 19 and Joint Military Passenger Equalization Agreement No. 19. By the terms of the first, the carriers parties thereto agreed to carry members of the armed forces, and some other classes, traveling on Government transportation requests, at net fares established as prescribed in Joint Military Passenger Equalization Agreement No. 19, less 5% where no land-grant deductions were applicable and less 3% where land-grant deductions were applicable. In Joint Military Passenger Equalization Agreement No. 19, the carriers parties thereto agreed to accept for the transportation of persons for whom the United States Government was lawfully entitled to reduced fares or charges over land-grant routes,
the lowest net fare or charge and the lowest net excess baggage rate lawfully available, as derived through deductions account of land-grant distance from the fare or charge, FROM POINT OF ORIGIN TO DESTINATION, applying via routes established under the provisions of Condition 1, paragraphs (J1), (/#), (JS), (</J), or (J5), in the order of their precedence, recognized as a usually traveled route for military traffic at time of movement.
*799 The Joint Military Passenger Equalization Agreement also contained the following provision under the heading Conditions:
(6) Method for Determining Usually Traveled Boutes for Military Traffic.
A usually traveled route for Military traffic as referred to herein is a route authorized in lawfully filed tariffs from starting point to destination, established under the grovisions of Condition 1 hereof, over which it would e practicable and economical to actually route individual, special car or special train military traffic as the case may be. What constitutes a “usually traveled route for Military traffic” as provided in this agreement shall, in the first instance, be construed by the Administrative Officers of the Military branches of the United States Government, provided that distance, time in transit, track connections, train service and connections, points oí interchange in accordance with the established practices of the carriers in handling commercial traffic and other pertinent conditions shall be considered as factors in determining the question; but it is mutually agreed that before such determination is made, carriers shall be called upon for an expression of their views as to the use of any suggested route and as to the basis for establishing the net fares; this action in no way to prejudice the right of the carriers to file a suit in the Court of Claims for adjudication on its merits in any case in which the decision of the Government representatives is unsatisfactory to the carriers; provided further that in any such proceedings in the Court of Claims, the parties hereto hereby agree that no evidence shall be admissible of the right of the said Administrative Officers of the Military branches of the Government to determine the question in the first instance.
4. The plaintiff’s bills for the passenger service rendered as stated in finding 2 were submitted to the defendant and paid in the amount of $4,186.00. Subsequently, upon audit, overpayments were determined by the General Accounting Office and the plaintiff was notified that unless the overpay-ments were refunded the amount thereof would be deducted from other bills due the plaintiff. On September 2, 1948, the plaintiff refunded under protest the sum of $851.76.
5. The net fare claimed by the plaintiff is $11.38, derived from a gross fare of $12.35, via the plaintiff’s lines to Everett, *800 Georgia, Southern Railway to Atlanta, Georgia, and Nashville, Chattanooga and St. Louis Railway to destination as follows:
Gross fare_$12. 85
Land-grant deduction_ . 62
11.73
Less 3%_ . 35
11. 38
6.The net fare paid by the defendant is $9.16, derived from a gross fare of $15.40, via the plaintiff’s lines to Chattahoochee, Florida, Louisville & Nashville Railroad to Nashville, Tennessee, and Nashville, Chattanooga and St. Louis Railway to destination, as follows:
Gross fare_$15.40
Land-grant deduction_ 5.96
9.44
Less 3%_ .28
9.16
7. The issue in this case is whether the route via Chattahoochee and Nashville, used by the General Accounting Office to establish a net fare of $9.16, was a usually traveled route within the meaning of the Joint Military Passenger Equalization Agreement for military traffic at the time of the movements in question.
8. If the Chattahoochee-Nashville route is not available under the terms of the Joint Military Passenger Equalization Agreement, the lowest net fare available is $11.38 established via Everett and Atlanta, Georgia.
9. On November 23,1951, the Southern Passenger Association, of which the plaintiff is a member, addressed a letter to the Chairman, Usually Traveled Route Committee, Gravelly Point, Washington, D. C., referring to the two movements described in finding 2 above, stating that the carriers contended that the route via “SAL Chattahoochee, L & N Nashville, thence NC & StL” should not be considered as a usually traveled route for special train military traffic, and *801 requesting a ruling by the Usually Traveled Route Committee. On January 7, 1953, Lt. Col. E. D. K. Hoehne, Chairman, Usually Traveled Route Committee, replied to the Southern Passenger Association as follows:
1.In reply to reference (c), you are advised that in the opinion of the Usually Traveled Route Committee, the route from Camp Blanding, Florida, to Camp Forrest, Tennessee, via SAL Chattahoochee, L&N Nashville, thence NC&StL, was not a usually traveled route for special train military traffic under "the schedules in effect in April 1943.
10. A map attached to plaintiff’s proposed findings of fact, which is incorporated in this report by reference, shows five routes from Camp Blanding, Florida, to Camp Forrest, Tennessee, as follows:
1. Via Georgia Southern & Florida, as initial carrier, and Southern Railway lines.
2. Via Seaboard Air Line as initial carriers, through Savannah.
3. Via SAL as initial carrier, and Atlantic Coast Line from Jacksonville.
4. Via SAL to Everett, Georgia, and Southern lines and Nashville, Chattanooga & St. Louis.
5. Via SAL to Chattahoochee, Florida, Louisville & Nashville to Nashville, Tennessee, and NC&StL.
11. The movements in question were a part of the movement of two divisions and a few separately scheduled trains, from Camp Blanding, Florida, to Camp Forrest, Tennessee, in March, April, May and June 1943. At that time Camp Blanding was served by two railroads, the Georgia Southern & Florida Railway and the Seaboard Air Line Railroad. Approximately half the movements in question were handled by the Georgia Southern & Florida as the initial carrier, and half by the Seaboard as the initial carrier. The movements handled by the Georgia Southern & Florida were over the first route noted in finding 10, via the Southern Railway lines, to Chattanooga, Tennessee, and NC&StL to destination. The movements handled by the Seaboard, were in most instances (including the two movements described in plaintiff’s petition) over the second route noted in finding 10 through Savannah, and in some instances over the third *802 route noted in finding 10 through Jacksonville, Florida, and Albany, Georgia.
12. The distances from Camp Blanding to Camp Forrest, via the several routes described above, are as follows:

Miles

1. Georgia Southern & Florida and Southern lines_588
2. Seaboard to Savannah, and Central of Georgia and NC&StL_697
3. Seaboard to Jacksonville, and ACL, Central of Georgia, and NC&StL-667
4. Seaboard to Everett, Georgia, and Southern and NC&StL_599
5. Seaboard to Chattahoochee, Florida, and L&N and NC&StL_921
13. Military coach-freight trains are not run on passenger train schedules and the running time of such mixed trains is considerably longer than the running time of passenger trains over the same routes. The approximate running time for mixed coach-freight trains from Camp Blanding to Camp Forrest via the Seaboard through Savannah, a distance of 697 miles, as estimated by the passenger and operating representatives of the participating carriers, was 36 hours. The two movements in question over the Seaboard, through Savannah, were actually handled in 30 hours 20 minutes, and 32 hours 35 minutes, respectively. This was due in part to a cut-off which avoided Jacksonville and shortened the route by about 12 miles and saved several hours running time, but this cut-off was not always available and could not be anticipated in estimating the running time of special military trains. The approximate overall running time for mixed coach-freight trains from Camp Blanding to Camp Forrest via the GS&F and Southern lines, a distance of 588 miles, as estimated by the passenger and operating representatives of the participating carriers, was 29 hours 15 minutes. The approximate overall running time for mixed coach-freight trains from Camp Bland-ing to Camp Forrest via the Seaboard to Everett, Georgia, and thence C of G and NC&StL, a distance of 599 miles, was 31 hours 45 minutes. The estimated overall running time furnished the Usually Traveled Koute Committee *803 for mixed coach-freight trains from Camp Blanding to Camp Forrest, via Chattachoochee and Pensacola, Florida, and Nashville, Tennessee, a distance of 921 miles, was 44 hours 15 minutes. Although this last mentioned route was not used by military mixed coach-freight trains and the exact running time for such trains is not available, it is found, based on other published schedules, that the estimate given the Committee was excessive.
14. The route from Camp Blanding to Camp Forrest, via Chattahoochee and Pensacola, Florida, and Nashville, Tennessee, was a circuitous route, longer in mileage and running time, which was neither suggested nor considered by the participating railroads or transportation officers of the Army as a practicable route for military traffic between those points. It was not used for such movements in March, April, May and June 1943, and in so far as appears from the evidence was never used for any military movements between Camp Blanding and Camp Forrest.
15. Taking into consideration distance, time, and operating conditions at the time of these movements, the route via Chattahoochee and Pensacola, Florida, and Nashville, Tennessee, was not a practicable or economical route for military traffic in mixed coach-freight trains in March, May, and June 1943.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States eight hundred and eight dollars and eight cents ($808.08).